Davies Adoption Case

Argued January 9, 1946. Before Maxey, C. J., Drew, Linn, Stern, Patterson, Stearne and Jones, JJ.

D. H. Jenkins, with him James J. Ligi, for appellants.

Edward T. Jordan, with him David J. Reedy, Jr., for appellee.

OPINION BY MR. JUSTICE JONES, March 25, 1946:

This is an appeal from an Orphans' Court decree dismissing a petition for adoption. The mother of the girl child involved refused her consent and appeared in opposition to the petition. The appellant petitioners are an uncle and a paternal aunt with whom the child has lived and by whom she has been reared and cared for exclusively since her earliest infancy. The only matter in issue is whether the mother, who is the sole surviving parent, abandoned the child thereby rendering unnecessary her consent to the proposed adoption: see Act of April 4, 1925, P. L. 127, Sec. 2 (c), as amended (1 P.S. § 2). The learned trial judge found as a fact and concluded as a matter of law that the abandonment "required under the provisions of the Act of Assembly" had not been proven; and, the final decree from which the petitioners have appealed was thereupon entered. The question involved is whether the alleged abandonment was proven with required legal sufficiency.

The appellee urges upon us that under the Pennsylvania Adoption Act, loc. cit. supra, the fact of abandonment, as the alternative of a parent's consent to an adoption, must be ". . . proven to the satisfaction of the court or judge hearing the petition . . ." and that the trial judge in the instant case "found there was no abandonment". The conclusion of a trial court in such regard is reviewable none the less: Weinbach's Appeal, 316 Pa. 333, 336, 175 A. 500. Cf. also Hazuka's Case, 345 Pa. 432, 435, 29 A. 2d 88. While it so happens that in both the Hazuka and Weinbach cases, supra, abandon-

ment was proven to the satisfaction of the respective trial courts, our power to review is no different where the hearing judge is not satisfied that abandonment was proven. The term "satisfaction", when used to specify the degree of persuasion which a trier of facts must experience from the evidence to warrant his making a particular finding, has "a clear legal meaning". The standard of proof so required does not mean that the factfinder may "decide the issue arbitrarily".: See *Toplis & Harding, Inc. v. Murphy*, 384 Ill. 463, 51 N.E. 2d 505, 509.

It could not have been the legislature's intention in the Adoption Act to authorize a court or judge hearing a petition to ignore out of hand a conclusion with respect to the proofs of abandonment which the evidence, as accredited by such court or judge, legally warrants and impels. We hold, therefore, that the requirement that the fact of abandonment is to be ". . . proven to the satisfaction of the court or judge hearing the petition . . ." means that the evidence shall be legally sufficient to support the finding and that it does not mean that the finding of a trial judge in such connection is *ipso facto* binding and conclusive without right to the party aggrieved to appellate review of the court's action. It has been held, however, that upon an appeal from a final decree or order in an adoption proceeding, the matter is before the reviewing court as on certiorari. In that situation our examination of the notes of testimony taken on the hearing below is limited to determining whether there is any evidence to support the findings and ultimate conclusion of the trial judge: *Weinbach's Appeal*, supra, at pp. 336-337.

The sustainable findings in this case as amplified and explained by the testimony of witnesses whom the trial judge accredited disclose the following factual situation.

The child in controversy was born on March 13, 1942, in a hospital in Washington, D. C., where the mother, a native of Scranton, Pennsylvania, was employed as a

typist in a government office. The father, Joseph Davies, who also was from Scranton, was in the military service of the United States. Anticipating the baby's birth, he obtained a leave and, arriving at the hospital the day following the birth, he visited the mother and child there.

On April 18, 1942, when the baby was but five weeks old, the mother, accompanied by a woman friend, took the child on an all-night bus trip from Washington to Scranton to the home of Mrs. Ruth Davies, Joseph's mother, with whom resided her daughter, Esther (Davies) Phillips, and the latter's husband, Walter P. Phillips, the present appellants.

When the child's mother and her companion (the latter carrying the baby) entered the Davies home, the companion handed the baby to Mrs. Phillips, the mother saying at the same time, "Here she is, she is yours; I don't want no part of her." The mother and her friend remained in the Davies home overnight. The next morning (Sunday), upon being bidden by Mrs. Phillips to hold the baby after she had bathed it, the mother refused to do so and repeated, "I don't want no part of her." It was testified at the hearing, without denial from the mother, that, on the same day she had said that, had it not been for the fact that the father had come to the hospital and had there seen the baby alive, she would have placed it in "a home" and have told him that it was stillborn. The court below justifiably found that the respondent ". . . did not deny the statements she was alleged to have made on that occasion" (i.e., the time of the delivery of the baby to the Davies home).

Late in the afternoon of the day last above-mentioned the mother ". . . left the Davies home and her child and resumed her work in Washington, D. C. She visited the child some three or four months later but did not again return for two years." The fact is that the one time that she saw the child (in what was actually more than two years) was around June 1942 when Joseph Davies was on a visit to his mother at her home in Scranton. During

the better than two-year period following that visit, the mother of the child was in Scranton twice, once before going to Atlantic City on vacation and again to attend the funeral of an uncle, but on neither of those occasions did she go to see the child, as she herself admitted. In the meantime (September 1943) Joseph Davies, the father, was sent overseas in military service.

In June of 1944 (the child then being over two years old), Walter Phillips wrote to Mrs. Joseph Davies in Washington offering her the use of his cabin for her vacation. To that invitation she responded by letter which, in material part, reads as follows:

"June 22nd [1944]

"Dear Walter,

"I've received your letter in which you so generously offer to arrange for my spending my vacation at your cabin. While I thank you Walter, for all your thoughtfulness, I'm afraid I'm going to have to decline. I don't think I'm quite ready to spend any time at all with the child yet. I feel nothing but resentment for her and all she stands for. I know you will say that I have absolutely no reason for thinking as I do. . . . However, I still resent her presence. I think the only thing that will make me able to stand her is the feeling Joe has for her and sometimes I even wonder if I think enough of him to make myself put up with something I have absolutely no desire to be with. All this may work itself out in time. I do ask that I have a little time alone with Joe—a few weeks will be adequate—and try to reach a decision with myself as to how I'm going to manage the rest of my life.

"I want to thank you and the folks for having so much patience with me. I know that if it were anyone else their patience would have reached an end long ago. I'm afraid there isn't anything I can do about it though except let things take a natural course and hope that sometime in the near future I get some much needed sense. For the present, though, everything will have to remain as it is."

Near the end of October 1944, Mrs. Ruth Davies received a telegram from the War Department notifying her that her son, Joseph, had been killed in action in Germany on September 29, 1944. Walter Phillips immediately so notified Mrs. Joseph Davies in Washington by telegram. A few days later (which would be the last of October or the first part of November 1944) she went to Scranton and on that occasion saw the child three times. On one of her visits to the Davies home at that time she brought with her her mother, Mrs. Mary Casey. Although Mrs. Casey lives in Scranton and has lived there many years, that was the first and only time that she ever saw her daughter's child up to the time of the hearing in this matter in January 1945.

After a few days in Scranton following the word of her husband's death, Mrs. Joseph Davies returned to Washington. On December 15, 1944, she wrote the Phillips a letter, which they received the following day, wherein she asked them to have the child ready for her to take away to another home. Six days later the Phillips initiated the proceeding here involved.

In her letter of December 15th to the Phillips, Mrs. Davies enclosed ten dollars to be used in buying a Christmas gift for the child who was then well along in her third year. That was the first time the mother had ever sent the child *anything*. Mrs. Ruth Davies and the Phillips had made many friendly efforts to induce in Mrs. Joseph Davies a more natural feeling for her child but to no avail. In their letters to her, which she put in evidence, they uniformly spoke of the child in loving terms; told glowingly of her progress and development; and, as Mrs. Joseph Davies admitted, they had enclosed pictures of the baby, "maybe four at a time", for an estimated total "of 25". Yet, in her responses, Mrs. Joseph Davies *never even mentioned* the child except for her letter of June 22, 1944, to Walter Phillips (expressing her bitter resentment of the child) and her letter of December 15, 1944, demanding its return.

The Phillips have no children of their own. From the day they received the Davies baby, they have continuously given it the love, care and training which devoted. and responsible natural parents are accustomed to give. to their children. In all respects, they have treated the child as if it were their own. They have provided it with the medical supervision and attention which an infant or child of tender years requires; they had it baptized in the church of its deceased father; they have furnished it with its food and clothing and have supplied it with its toys and entertainment. In short, they have at all times ministered to the child's care, comfort and health. From the outset, they assumed to exercise and, ever since, have faithfully discharged the responsibility of parents to the child who has known no other parent.

The respondent expressly admitted at the hearing that the Phillips are law-abiding citizens; that they bear a good reputation; that they "are able to provide a proper home" for the child; that they "are able to care for, support, maintain and educate her in a manner conducive to her welfare"; and that they "will perform all the duties of parents toward her." In connection with the petitioners' averred belief that the child's welfare would be promoted by the proposed adoption, the respondent also expressly admitted, as supporting such belief, the fact that the child, if adopted, would thereby be "assured of a good home and education and the proper rearing and treatment necessary for her welfare."

The respondent's case consisted entirely of her objection to the adoption; her subjective testimony that she had had a change of "attitude" toward the child since her husband's death; that she had established a bank account to the joint credit of herself and her mother, Mrs. Casey, wherein was deposited "the proceeds of the United States Government allotment made to her as the wife of Joseph Davies"; and that, out of her government allotment of fifty dollars a month, she had sent, beginning in January 1944, "$20.00 [a month] for

the support of the child" up to September 1944. The petitioners admitted that during the period last mentioned Mrs. Joseph Davies had enclosed money in letters to members of the Davies household, sometimes a twenty and sometimes a ten dollar bill, for an estimated total of sixty dollars. But, as the letters made no mention of the child, it had been assumed by Mrs. Ruth Davies and the Phillips that the money was being sent to Mrs. Ruth Davies at the instance of her son, Joseph, on account of what she had given him in the past. The trial court made no specific finding in this connection, merely reciting that the respondent had *said* "that she . . . sent twenty dollars a month to Mrs. Phillips for the child. . . ." Treating that recital most favorably to the respondent, it can mean no more than the most that she testified to, viz., that from January 1944 to September 1944 she had sent twenty dollars a month, for a total of one hundred and sixty dollars, for the support of the child.

What the change of "attitude" was, that the respondent experienced toward the child, she did not say. It is certain, however, that she neither expressed nor evinced any desire or intention to assume responsibility for the child's care and training. She testified that under "the arrangements" she had in mind for the child "She is to stay with my mother [in Scranton]. . . . While my mother [Mrs. Casey] is physically able to care for the child with the aid of my sister, I will keep my job [in Washington]." As will be recalled, the child was in Scranton two and a half years before Mrs. Casey went to see it.

There was no evidence to support the trial court's ultimate conclusion that abandonment had not been proven in this case. Our courts have not hesitated to find abandonment from circumstances not as conclusive in relevant regard as were here shown nor have they refrained from raising the disqualification to consent against an offending parent even though such parent

was the mother: cf. *Hazuka's Case,* supra; *Weinbach's. Appeal,* supra; *In Re: Adoption of Elizabeth McCann,* 104 Pa. Superior Ct. 196, 159 A. 334; *In Re Adoption of Shirley Jane Curry,* 15 Lehigh County Law, Journal 354; *Adoption of Dorothy H. Moul,* 50 York Legal Record 205; *Adoption of Pauline Fay Ogurcak,* 35 Berks County Law Journal 127; *In re Adoption of Walter Malek,* 34 Berks County Law Journal 7; *Adoption of Lee Clark, a Minor,* 37 Luzerne Legal Register Reports 329. The facts of the case last cited are strikingly similar to the present. The hearing judge in that case had no difficulty in finding that the abandonment was proven to his satisfaction. Nor did the paper which that mother had signed, upon giving up her child, operate as a binding waiver of her rights to the child. The mother at the time of signing it was not of legal age. It was but a piece of evidence of her intent to abandon.

Abandonment is not an ambulatory thing the legal effects of which a delinquent parent may dissipate at will by the expression of a desire for the return of the discarded child. We do not mean to say that the natural parental right to a child, which has been nullified by abandonment, may not later be retrieved. It may be. But, as the parent's consent to an adoption is no longer necessary, once abandonment has been proven with required legal sufficiency, the welfare of the abandoned child is the primary and paramount concern of the court unaffected by the desire or caprice of the abandoning parent.

When, then, does abandonment become complete? That is a question of fact to be determined from the evidence. It requires an intent to escape parental responsibility, and conduct in effectuation of such intent: see *Hazuka's Case,* supra. However, the inexorable circumstances of a child that has been abandoned may soon render the abandonment effectual. That is necessarily so. A child's natural needs for food, clothing and shelter demand that someone immediately assume the

attendant responsibility which an abandoning parent has ignored; and, that responsibility endures constantly. It does not await the capricious decision of an uncertain parent, perhaps, years later. The longer the responsibility continues to be discharged capably by the foster parent, the stronger become the ties that form out of the new relationship until there comes a time—possibly, not long deferred,—when the welfare of the child may justly require that the parental responsibility be allowed to remain where the abandoning parent has willingly permitted it to be.

In *Weinbach's Appeal,* supra, we quoted at length (pp. 339-340) from *Winans v. Luppie,* 47 N. J. Eq. 302, 304, 20 A. 969, "as indicating the wise view of cases of this class". The pertinency of the law, as there stated, to the findings and undisputed evidence of the instant case justify our quoting again, but more briefly, from the same source as follows: "It [i.e., abandonment] fairly may, and in our judgment does, import any conduct on the part of the parent which evinces a settled purpose to forego all parental duties and relinquish all parental claim to the child. . . . when once the abandonment is shown to have existed, it becomes a judicial question whether it really has been terminated or can be, consistently with the welfare of the child. When, in pursuance perhaps of the abandonment, new ties have been formed and a new station in life has been taken by the child, it might be unjust that, solely because of the parents' caprice, legal sanction should be refused to the new conditions." The emotional disturbance to a child that would threaten from its being removed summarily and permanently from familiar and agreeable surroundings and associations, incident to the only parental control and supervision it has ever known, could have a very harmful effect on the child's whole life. Fortunately, the law's regard for a child's welfare does not admit of any such injury or harm being done it.

The overwhelming proofs in this case are that the mother abandoned the child on April 18, 1942. And,

from that day down to December 15, 1944, her every word and act was in effectuation of an intent to render her separation from the child as complete as possible. That she succeeded admits of no doubt. In furtherance of her undenied declarations of such a desire and intent, there was but her one visit to the child when it was three or four months old and then not another for more than two years although she was in Scranton twice during that period with time available to see the child had she cared to do so. And, throughout the same relatively long period she made no inquiry concerning the child; she sent it no gift, no bit of clothing, no toy, not even a card of greeting to evidence a thought for the child. Her letter of June 22, 1944, to Walter Phillips (more than two years after she had deliberately given up the child's care and custody) not only plainly stated a continued dislike of the child but clearly indicated that, even then, she had neither a desire to assume parental responsibility nor thought of changing the child's situation. Certainly, the child's welfare was not to be subject to the precariousness of a later asserted change of mind on the mother's part. So far as human efforts enter into the circumstance of continued life and health, the fact that the child has lived and has thriven since April 18, 1942, is not due to any care or attention given it by its mother. She has never yet evinced the least desire to assume responsibility for the child's *care* and *training.* Nor, in so saying, do we disregard her temporary pecuniary contribution to the child's support. That was belated and relatively small. In any event "The statutory notion of abandonment" does not require that the parent cease to feel any concern for the child's interests: *Winans v. Luppie,* supra. Incidentally, in all of the cases cited, supra, where adoption was awarded over the objections of abandoning mothers, each of the latter had sought, by her objection, to reassume parental responsibility and not merely to obtain control of the child in order to hand it over to someone else.

There is no merit and certainly no pertinency in the appellee's contention that, inasmuch as the father was alive when the mother deposited the child with the Phillips, there could have been no abandonment. Parenthetically, it may be noted that there is testimony in the record, elicited by the respondent's cross-examination of Walter Phillips, to the effect that the father, cognizant of the mother's abandonment of the child, fully realized the situation and that he, before going overseas, had solicited the Phillips to adopt the child which, out of a regard for the father's love for the child and his rights with respect to it, they were reluctant to do while he was necessarily separated from the child. But, however, that may be, the question here involved is whether the mother abandoned the child. As the surviving parent, it was only *her* consent to the adoption that was necessary or, failing that, proper proof that *she* had abandoned the child. An abandoning parent can claim no right to control or determine the destiny of a child on the ground that the other parent had remained faithful to it.

The trial judge erred in concluding that the abandonment alleged in this case had not been proven. It was established with required legal sufficiency. The provision in the statute that the proofs be "to the satisfaction of the court or judge hearing the petition" was therefore met. Consequently, the mother's consent to the adoption was unnecessary. It also clearly appears that the child's welfare will best be served and promoted by her being continued under the parental authority, control and responsibility of the petitioners. Their qualifications to act as the child's legal parents were not only competently established but are unquestioned. It was therefore error for the trial court to dismiss the petition.

The decree of the court below is reversed, at the appellee's costs, with directions that a decree of adoption be entered as prayed for.