## Diana Adoption Case.

Argued March 23, 1949. Before RHODES, P. J., HIRT, RENO, DITHRICH, ARNOLD and FINE, JJ. (ROSS, J., absent).

*John Patrick Walsh,* with him *Nicholas A. Cipriani,* for appellants.

*Vincent C. Veldorale,* with him *Philip J. Franzese,* for appellee.

OPINION BY RENO, J., July 15, 1949:

Anthony Astrella and his wife, Lucille, have appealed from an order of the court below dismissing their petition for the adoption of Marie Ann Diana. The court held that the child's mother, Minnie Diana, had not given valid consent for the child's adoption and had not abandoned the child within the meaning of the Act of April 4, 1925, P. L. 127, as last amended by the Act of June 30, 1947, P. L. 1180, 1 PS §1, et seq.

The child was born out of wedlock in St. Agnes Hospital, Philadelphia, on February 18, 1947. Before the child was born the mother arranged with her obstetrician, Dr. Anthony Nicolo, to have the child adopted

and he in turn informed the Astrellas of her desire. Eight days after the birth, the mother, 25 years old, accompanied by her older brother, took the child to the office of Dr. Nicolo, where she signed a document and delivered the child to him. On the same day Dr. Nicolo delivered the child to appellants who have had it ever since.

The document recited that the mother "has no wish or desire to rear or raise said minor as her child"; that the putative father "has never acknowledged the child and has refused to contribute to the maintenance of the said child"; and that Dr. Nicolo "is able to place said minor child in a private home of suitable persons who will adopt said child." It proceeds to grant to Dr. Nicolo "the care, custody and control" of the child and "completely surrenders" the child to him "for the purpose that the said child may be placed for adoption by a person or persons found suitable in the exclusive judgment of" Dr. Nicolo. The mother also consented "to such adoption as fully as she could if personally present at any hearing before a Court"; relieves petitioners for adoption "from procuring or requiring any further consent to such adoption"; and agrees that the document "may be filed" in any court "that may require a separate and further consent on the part of the mother."

The mother testified that she signed the document because: "My family said if I had taken the child home that they wouldn't have anything to do with me, and the doctor knows that." The doctor testified that when she signed the document: "She was a little nervous, crying." This the learned hearing judge construed as an admission by the doctor "that the mother was emotionally upset" when she delivered the child to him. Doubtless she was. In the circumstances, having just left the hospital, with notice from her parents that she was not to bring the child home, it was natural

that she should be nervous and cry. Yet there is not a line of testimony that she did not fully comprehend the nature and character of the instrument she signed. Indeed it was a fulfillment of her own desires, the only method whereby she could assure herself that the child for which she could not provide care and nurture would be cared for and nurtured by suitable parents. So far as the record indicates Dr. Nicolo was her friend, willing to help her in her dilemma, with no personal or professional interest in the matter.

Nevertheless, we share the hearing judge's reluctance to find consent in an instrument signed in the circumstances here present. As evidence of consent we lay it to one side, and do not rest the decision on the document. However, it is relevant in the consideration of the firmer ground that the mother abandoned her child. It is an element to be weighed on the question whether she abandoned the child and that the "abandonment has continued for a period of at least six months": Act of 1947, supra, §1.

The hearing was held on April 19, 1948. Almost 14 months had passed. During that period, according to her own testimony, soon after she delivered the child to him, she asked Dr. Nicolo about the child and he told her: "Don't worry about anything; she is in good hands." At some time, not clearly established but apparently three or four months later, according to her testimony, she told the doctor she wanted the child back, and "he tried to talk me out of it." Dr. Nicolo testified that she never requested the return of the child. But she never visited the child; she made no attempt to ascertain the persons in whose custody it had been placed; she neither provided or offered to provide support for the child although she was steadily employed at $45 per week; she never presented gifts to it; its birthday was unmarked by any token of her affection. There is not an iota of testimony that the

whereabouts of the child were concealed from her or that she could not upon inquiry have located her. Her interest in her daughter was negligible, until she was sparked into action by a probation officer who visited her in reference to the adoption petition filed in the court below.

The inescapable conclusion is that the mother abandoned her child. The document, even though it is not regarded as a formal consent to an adoption and is not in itself an abandonment, is at least evidence which bears upon the question of abandonment and shows an intent to abandon. Save only her feeble request to the doctor that the child be returned and her appearance in court at the suggestion of the probation officer, everything that occurred subsequently is consistent with the primary act; nothing that occurred subsequently can be said to be a real renunciation of her intent to abandon. Abandonment "imports any conduct on the part of the parent which evidences a settled purpose to forego all parental duties and relinquishes all parental claim to the child:" *Schwab Adoption Case,* 355 Pa. 534, 538, 50 A. 2d 504. And "when once the abandonment is shown to have existed, it becomes a judicial question whether it really has been terminated or can be, consistently with the welfare of the child": *Weinbach's Appeal,* 316 Pa. 333, 339, 175 A. 500.

In *Davies Adoption Case,* 353 Pa. 579, 587, 46 A. 2d 252, Mr. Justice JONES stated: "Abandonment is not an ambulatory thing the legal effects of which a delinquent parent may dissipate at will by the expression of a desire for the return of the discarded child. We do not mean to say that the natural parental right to a child, which has been nullified by abandonment, may not later be retrieved. It may be. But, as the parent's consent to an adoption is no longer necessary, once abandonment has been proven with required legal sufficiency, the welfare of the abandoned child is the primary

and paramount concern of the court unaffected by the desire or caprice of the abandoning parent."

The hearing judge found that the Astrellas "are desirable parents for this child . . . I see them before me and I am quite convinced that they would furnish the child a good home." Mr. Astrella, 31 years old, is the proprietor of a flower shop; his income is $50 or $60 per week; with his wife he lives in his father's home in Philadelphia on which he pays the taxes and interest. Mrs. Astrella, 33 years of age, is a housewife, who devotes her full time to her home and the child. They have never had children. There is not the slightest intimation in the record that the child has not had the best of care and the love and affection of the foster parents.

Even now the mother does not intend to devote all her time to her daughter and make a home for her. She proposes to take it to the home of her 39-year-old married sister in Upper Darby who will take care of it while she is working. The record contains no information concerning the sister, her family or her home and she did not appear in court. The abandonment having been proven, the welfare of the child becomes the paramount concern, and it is difficult to understand how its welfare would be better served by taking it from its present custodians and the environment they have furnished for it.

Recently Chief Justice MAXEY said: "Nothing could be more cruel than the forceable separation of a child from either its real or foster parents by whom it has been lovingly cared for and to whom it is bound by strong ties of affection; to a child it is equally cruel whether the separation is brought about by 'kidnapping' or by legal process. In passing on the contested custody of children no judge can do justice without considering the human aspect of his problem": *Com. ex rel. Children's Aid Society v. Gard*, 362 Pa. 85, 66 A. 2d 300.

That the statement has equal relevancy in an adoption case is evidenced by a similar expression in *Davies Adoption Case,* supra, p. 588, to which the Chief Justice referred.

The case is here on a broad certiorari, and this Court is authorized to reverse where the evidence does not sustain the findings of fact of the court below. *Davies Adoption Case,* supra, p. 581. As we have demonstrated, the evidence does not sustain the findings of the hearing judge.

The order of the court below is reversed, at appellee's costs, and the record is remitted, with directions that a decree of adoption be entered as prayed for.