## Harvey Adoption Case.

2

Argued November 10, 1952.   Before STERN, C. J., STEARNE, JONES, BELL, CHIDSEY and MUSMANNO, JJ.

*Norman Landy*, with him *Norman Paul Wolken, George J. Barco, Wolken & Landy* and *Barco & Barco,* for appellant.

*Gerald D. Prather*, with him *Leland J. Culbertson,* for appellees.

OPINION BY MR. CHIEF JUSTICE HORACE STERN, January 12, 1953:

Proceedings for the adoption of a child must be carefully differentiated from those involving merely a question of its custody; they are of far greater import and involve more serious consequences. Custody may be awarded for a more or less temporary duration, but a decree of adoption terminates forever all relations between the child and its natural parents,

4

severs it entirely from its own family tree and engrafts it upon that of its new parentage: *Schwab Adoption Case*, 355 Pa. 534, 536, 50 A. 2d 504, 505. For all purposes, legal and practical, the child thenceforth is dead to the mother who gave it birth; she has lost the right ever to see her child again or even to know of its whereabouts. Because, therefore, of these direful results of an adverse adoption proceeding the rights of the natural parent should not be terminated unless the record clearly warrants such a decree: *Southard Adoption Case*, 358 Pa. 386, 392, 57 A. 2d 904, 907.

The facts are these: Bonnie Sue Harvey, living in a small village in West Virginia, found herself pregnant, at the age of sixteen years and while still a pupil in high school, with an illegitimate child. She and her parents made arrangements with the Roselia Foundling and Maternity Hospital in Pittsburgh for her pre-natal care and confinement. After being there for two months her child, Sharon Ann, was born on April 29, 1951. Her father paid the Hospital for Bonnie Sue's board up to that time and also the charges for the delivery. Nine days thereafter she left in the company of her parents, returned to their home in West Virginia, and continued to reside with them until her marriage on August 18, 1951 to Kenneth Stanley; she then went to live with her husband in a small neighboring community. The child remained in the Roselia Hospital until September 27, 1951 when it was placed by the Hospital with Mr. and Mrs. Arthur J. Marhoefer of Meadville, Crawford County, for adoption; they have since had custody of it and have filed the present petition for its adoption. The mother, now Bonnie Sue Stanley, has filed a petition for a writ of habeas corpus to regain the custody of her child. The two petitions being heard together, the court made an order authorizing the Marhoefers to adopt the child

and awarding them its custody. Bonnie Sue Stanley appeals.

The Act of April 4, 1925, P. L. 127, as amended by the Act of June 30, 1947, P. L. 1180, provides that the consent (to the adoption) of a parent who has abandoned the child for a period of at least six months shall be unnecessary, provided such fact is proven to the satisfaction of the court or judge hearing the petition. The first question in the case, therefore, is whether Bonnie Sue abandoned her child for that length of time. If she did, the second question then arises, whether the adoption sought would be for the best interests and welfare of the child itself: *Davies Adoption Case*, 353 Pa. 579, 587, 46 A. 2d 252, 256; *Susko Adoption Case*, 363 Pa. 78, 81, 82, 69 A. 2d 132, 134, 135; *Diana Adoption Case*, 165 Pa. Superior Ct. 12, 17, 67 A. 2d 751, 753; *Frasch Adoption Case*, 165 Pa. Superior Ct. 74, 78, 67 A. 2d 830, 832; *Oelberman Adoption Case*, 167 Pa. Superior Ct. 407, 413, 74 A. 2d 790, 793; *McNutt Appeal*, 169 Pa. Superior Ct. 641, 646, 84 A. 2d 360, 362. The statute does not provide for an appeal, but, on the other hand, it does not forbid one; therefore our review by certiorari is "in the broadest sense", including a consideration of the testimony to determine whether the findings of the court below are supported by competent evidence: *Kaufman Construction Co. v. Holcomb*, 357 Pa. 514, 518, 519, 55 A. 2d 534, 536; *Diana Adoption Case*, 165 Pa. Superior Ct. 12, 18, 67 A. 2d 751, 753; *Oelberman Adoption Case*, 167 Pa. Superior Ct. 407, 413, 74 A. 2d 790, 793. While the act provides for the proof of abandonment to the satisfaction of the judge hearing the petition, the court's finding in regard to that issue, being a deduction or inference from established facts and therefore the result of reasoning, is reviewable on appeal: *Southard Adoption Case*, 358 Pa. 386, 390, 391, 57 A.

2d 904, 906; *Davies Adoption Case,* 353 Pa. 579, 580, 581, 46 A. 2d 252, 253, 254; *Schwab Adoption Case,* 355 Pa. 534, 538, 50 A. 2d 504, 506.

Did Bonnie Sue abandon her child?

Abandonment has been defined in the authorities as importing "any conduct on the part of the parent which evidences a settled purpose to forego all parental duties and relinquishes all parental claim to the child." *Schwab Adoption Case,* 355 Pa. 534, 538, 50 A. 2d 504, 506, 507; *Southard Adoption Case,* 358 Pa. 386, 391, 57 A. 2d 904, 906; *Susko Adoption Case,* 363 Pa. 78, 82, 69 A. 2d 132, 135. For a mother to abandon her child means to give it up absolutely with the intent of never again claiming her right to it. Mere neglect does not necessarily constitute abandonment; ordinarily, to have that effect, it must be coupled with affirmative acts or declarations on her part indicating a positive intention to abandon. Abandonment may therefore be effected, sometimes by a mere formal legal instrument, sometimes by a course of conduct. *It is a matter of intention,* to be ascertained by what the parent says and does, viewed in the light of the particular circumstances of the case: *Hazuka's Case,* 345 Pa. 432, 435, 29 A. 2d 88, 89. Even where the natural parental right has been nullified by abandonment that right may be retrieved if its re-assertion is beneficial to the welfare of the abandoned child: *Davies Adoption Case,* 353 Pa. 579, 587, 46 A. 2d 252, 256.

Bonnie Sue, nine days after her confinement, signed a consent to adoption upon a form presented to her by a social worker at the Hospital. Apart from the fact of its execution at a time when she was hardly in a condition for mature deliberation on so important a matter, it was not binding upon her because the amendatory Act of June 30, 1947, P. L. 1180, section 2, inferentially provides that if the parent is a minor

under the age of 18 years her consent is not sufficient without that also of her parent or guardian. Moreover, as far as a mere formal consent to adoption is concerned it may be withdrawn even as late as the time of the hearing on the petition: *Susko Adoption Case,* 363 Pa. 78, 83, 69 A. 2d 132, 135.

What, then, was the conduct of Bonnie Sue, apart from her signing the consent to the adoption, to justify the court's finding that she had abandoned her child? Her only acts of commission and omission in that regard, as testified to at the hearing, were (1) declarations made by her at the Hospital that she wanted her child adopted, and (2) that she did not seek to take it from the Hospital or pay for its support there, from the time of its birth, April 29, 1951 until December 29, 1951. As to her declarations made before and immediately after the child was born of her desire to have it placed for adoption, there must be balanced against them many other declarations made by her both before she went to the Hospital and after her return therefrom—declarations made to her father, to her mother, to her uncle, to her aunt, to her brother, to another patient in the Hospital—that she wanted to keep her baby, that she intended to leave it at the Hospital for a while but would fetch and bring it back to her parents' home, where she herself was living, as soon as possible; according to her mother's testimony, she wanted, on returning from the Hospital, to get a job as soon as she felt able to work; her brother testified that she said she was going to try to obtain the money necessary to pay for the child's board without calling on her father for its support.* The court

---

* The social worker testified that Bonnie Sue told her it was her intention after she left the Hospital to pay for the child's board in installments thereafter, and to a Sister she stated that she would not be financially able to make such payments but

ruled out the testimony of these witnesses on the ground that such statements were self-serving declarations. This, in our opinion, was error extremely devastating to Bonnie Sue's case. Not only was it unfair, having admitted the testimony of her alleged declarations that she wanted to have the child placed for adoption, to reject her contrary declarations made to these other witnesses, but the rules of evidence do not require the holding of such declarations inadmissible on the ground that they are self-serving. Statements of design, intent, motive, or feeling, etc. are always admissible where such design, intent, motive or feeling is the very fact to be proved, and, since such declarations are expressive of a condition of mind, the declarant's own statements as to the existence of that condition are admissible, the only limitations as to their use being that they reveal a then existing state of mind and that they be made in a natural manner and not under circumstances of suspicion: VI Wigmore on Evidence, 3rd ed. pp. 79, 80, §1725.

As to the matter of Bonnie Sue's alleged neglect in not paying for her child's support after she left the Hospital and, as the court found, not demanding its return to her until December 29, 1951, all the surrounding circumstances must be borne in mind and her conduct appraised in the light thereof. Bonnie Sue was only 17 years of age when her illegitimate child was born; living with her parents in a small community she must have keenly realized that gossip and censorious criticism were to be expected from her neighbors and friends. It was natural, therefore, that she should have gone for her confinement to a city in an-

---

would do the best she could, whereupon the Sister told her that they would not press her. Obviously neither of these statements by her indicated deliberate intention on her part to abandon the child, but rather the contrary.

other State and that her initial impulse there was to have the child taken away altogether and, for that purpose, placed for adoption. But after she returned home and the early fears of disgrace had subsided, and after she found that her parents and her family generally were standing by her, and that her father and mother were themselves eager to have the child brought home to them, it was equally natural that her maternal instinct should assert itself and awaken in her the desire for re-possession of the child to which she had given birth. For a while, according to the evidence, she was nervous, shy of social contacts, and physically and emotionally upset. While the court did not credit her testimony and that of her witnesses that she had telephoned several times to the Hospital to make inquiries about the child and that she was later dismayed to learn that it had been taken away for adoption it may nevertheless be reasonably inferred—as she herself insists—that she always intended to reclaim it when she should find herself able to pay the Hospital for the child's support. In November she consulted a Child's Sheltering Home in Charleston, and in December a lawyer, to ascertain if she had the right to regain possession of the child in view of her having signed the consent to its adoption. In the light of these facts and circumstances, and even though we give consideration only to the testimony accepted by the court as credible, we are of opinion that Bonnie Sue did not, for a period of six months, "evidence a settled purpose to forego all parental duties and relinquish all parental claims" to her child.

Coming, then, to the second question, we are of the further opinion that even if abandonment *had* been proved and the consent of the mother therefore become unnecessary, the paramount consideration of the welfare of the child itself does not warrant the granting

of the petition for adoption. The Stanleys own and occupy a five room home, with bath, a yard and a small garden (apparently the same size as the Marhoefer home) and with adequate furniture; the husband earns a substantial wage. There is no reason to believe that Bonnie Sue is not living a proper, wholesome domestic life with her husband. It is true that the latter did not appear as a witness at the hearing, but it was testified that he knew of the child's existence before he married Bonnie Sue and was entirely agreeable to its being brought into their home. As already stated, the parents of Bonnie Sue are also eager to effect that purpose and are strongly supporting her in her efforts to that end, even to the extent of having offered the Hospital money for the child's return. In short, there is no apparent reason to believe that Sharon Ann would be any better off if adopted by the Marhoefers than if left to live with her own mother, or that the love she would there receive would be any less than that which would be given her by the persons—worthy people as they undoubtedly are—who desire to adopt her. Nor can it be said that a child of such tender years—even now less than two years old—may have formed such affectionate ties in its present home that it would be difficult for it to adjust itself to a new environment; an infant of that age easily forms new attachments. As for the Marhoefers, while, of course, it is appreciated that giving up the child will doubtless cause them sorrow, it must not be forgotten that when demand was originally made upon the Hospital for the return of Sharon Ann to her mother, a demand which from the very first they strenuously resisted, they had had possession of the child for a period of only three months,—a custody of far too short a duration for the development of any *permanent* deep-seated affection.

In No. 296 the decree of the court below is reversed and the petition for adoption is denied. In No. 297 the order of the court below is reversed and it is ordered that Sharon Ann be delivered into the custody of her mother. Costs in each appeal to be paid by the appellant.

---

DISSENTING OPINION BY MR. JUSTICE ALLEN M. STEARNE:

The legal problem presented is whether in an adoption case an appellate court will reverse a finding of abandonment made by a hearing judge, who alone saw and heard the witnesses, where such finding is amply supported by the testimony. The majority opinion repudiates such supported findings. I therefore dissent.

In *Schwab Adoption Case*, 355 Pa. 534, 50 A. 2d 504, we reversed the court below where a majority repudiated the finding of a hearing judge that the abandonment was not proven to his satisfaction. The majority in the present case, conversely, repudiate a supported finding that there was an abandonment.

I agree with the majority that "The statute does not provide for an appeal, but, on the other hand, it does not forbid one; therefore our review by certiorari is 'in the broadest sense', including a consideration of the testimony to determine whether the findings of the court below are supported by competent evidence". But by a review of the testimony in the "broad sense" is not meant that the appellate court reviews *all* the evidence—that which the hearing judge accepts and also rejects—and then *substitutes* its own judgment for that of the hearing judge. In appeals from decrees of adoption an appellate court does not review the *merits* of the case. The scope of the review

is that exercisable on *certiorari*: *Helen Frances Young's Adoption,* 259 Pa. 573, 103 A. 344; *Weinbach's Appeal,* 316 Pa. 333, 175 A. 500; *Davies Adoption Case,* 353 Pa. 579, 46 A. 2d 252; *Susko Adoption Case,* 363 Pa. 78, 69 A. 2d 132; *Adoption of Henry Bastin,* 10 Pa. Superior Ct. 570; *In re McGinness's Adoption,* 74 Pa. Superior Ct. 523; *Montgomery Adoption Case,* 167 Pa. Superior Ct. 635, 76 A. 2d 240. Our review is limited to ascertain whether there is sufficient evidence to support the findings. In *Susko Adoption Case,* supra, Chief Justice MAXEY said, p. 81: "The scope of review exercised by this Court in the instant [adoption] case is that exercisable on certiorari; and, consequently, we are required to review the testimony in an attempt to ascertain whether there was evidence sufficient to support the findings: Weinbach's Appeal, 316 Pa. 333, 175 A. 500." See also *McNutt Appeal,* 169 Pa. Superior Ct. 641, 646, 84 A. 2d 360. The Act of April 4, 1925, P. L. 127, sec. 1, as last amended by the Act of June 30, 1947, P. L. 1180, 1 PS 1, et seq. provides for adoption. Under section 2 of the act the consent of the mother of an illegitimate child is unnecessary where she has abandoned the child *"provided such fact is proven to the satisfaction of the court or judge hearing the petition, in which case such court or judge shall so find as a fact."*. (Emphasis supplied) In the present case the court below found as a fact that the natural mother had abandoned her infant illegitimate child. As stated by President Judge RHODES in *McNutt Appeal,* supra, p. 646: "Whether or not a child has been abandoned is a question of fact. Hazuka's Case, . . . 345 Pa. 432, 435, 29 A. 2d 88" and ". . . our scope of review is to determine whether there is evidence sufficient to support the findings."

A finding of abandonment, in the absence of a direct admission thereof, is a deduction or inference and

the result of reasoning: *Southard Adoption,* 358 Pa. 386, 390, 57 A. 2d 904. But inferences and deductions may only be drawn from *established findings* of the hearing judge. A contrary finding will not be reached by accepting testimony which the hearing judge rejected, or by our own conjecture or suspicion. Findings of fact of a hearing judge will never be disturbed unless there is manifest error or clear mistake. Such findings are like a verdict of a jury, which is not disturbed if there is sufficient evidence to support it, even though another judge might have reached another or different conclusion. Credibility of witnesses, the weight to be given their testimony because of their character, intelligence and knowledge of the subject, can much better be determined by the judge who hears them. The cases which support these principles are numerous, *inter alia, Jacob's Trust Estate,* 320 Pa. 539, 544, 183 A. 49; *Teats v. Anderson,* 358 Pa. 523, 527, 58 A. 2d 31; *Harbison Estate,* 365 Pa. 468, 473, 76 A. 2d 187.

The hearing judge was squarely faced with an issue of credibility. Witnesses gave diametrically contrary testimony. The situation is an old story too frequently repeated. Bonnie Sue Harvey, the mother of the child, a sixteen year old high school girl, residing in West Virginia, became pregnant. With her parents she came to Pittsburgh and made arrangements with the Roselia Foundling and Maternity Hospital (a charitable institution) for her pre-natal care. Two months thereafter, on April 29, 1951, the baby was born. Her board and charges for delivery were paid by her father. Nine days after delivery the mother signed a consent to adoption. (Because of her minority the consent as such was ineffective but, nevertheless, constituted an element of proof of abandonment). According to the testimony of the religious and lay officials of the hos-

pital, who are wholly disinterested, the mother expressed her desire to have the institution arrange for the child's adoption; she was fully aware of the nature of her relinquishment of her illegitimate child and was free from emotional disturbance; she left the hospital on May 8, 1951, and neither she nor her parents made any provisions whatever for the support and care of the child. On September 27, 1951, the child was placed in the custody of Mr. and Mrs. Arthur J. Marhoefer, of Meadville, Crawford County (whose character and ability to properly care for the child are unquestioned), preparatory to adoption.

A petition for adoption was filed February 29, 1952. On April 17, 1952, a petition for *habeas corpus* was filed. A joint hearing on both petitions was held May 8, 1952. There is no separate orphans' court in Crawford County. Judge Mook acted both as an orphans' court judge with respect to *adoption* and as judge of the court of common pleas as to *custody*. The following excerpt from his opinion for the court in banc clearly demonstrates that at the hearing on these two petitions ample testimony was presented from which the Judge could have found either abandonment or no abandonment, depending on which witnesses he believed: "A careful analysis of the credible evidence in this case leaves us no alternative but to find as a fact that Bonnie Sue Harvey abandoned her child for a period of more than six months. While the testimony of Sister Miriam Teresa has been violently attacked by the learned counsel for the respondent as interested, biased and prejudiced testimony, yet we find nothing whatsoever in the record to indicate that the Sister did not tell the truth in every detail so far as the conversations between herself and Bonnie Sue were concerned. As we have already mentioned, Sister Miriam Teresa testified that Bonnie Sue told her on

at least two occasions that she wanted to leave the baby for adoption. A social worker, Miss Kearns, testified that Bonnie Sue spoke to her about having the papers prepared and she drew up the papers, which Bonnie Sue signed with full knowledge of its contents. While this paper may not have legal sanction as a consent to the adoption of her child under the statute, yet it is evidence of her intention to abandon her child. We totally reject the testimony of Bonnie Sue Stanley that she did not know or understand the contents of this paper. While Bonnie Sue may not have been an adult at the time the paper was signed, yet from her appearance on the witness stand and from her testimony, we had no difficulty in reaching the conclusion that she was a young woman of normal intelligence and no person of her intelligence could possibly take even a casual glance at this paper without immediately seeing that it was entitled in heavy black type 'Consent to Adoption.' Furthermore, there is no reason to conclude that the responsible officials and social workers of so well a respected institution as the Roselia Foundling Home would engage in such slipshod methods as having a young mother of a new born baby sign so important a document without fully advising her of its nature and contents.

"Neither do we accept the explanation of Bonnie Sue Stanley that she was so emotionally upset on the day the paper was signed that she did not know what she was doing. On the day the paper was signed she took a trip to downtown Pittsburgh to shop with another girl from the institution and then walked back to the Home, which indicates to us that she had made a remarkable recovery from her confinement and was apparently in good health and spirits. Finally, there is the undisputed fact that on the very next day Bonnie Sue left the Home in the company of her parents

without taking the baby with her and without making any arrangements whatsoever about its future care and support. Now, if Bonnie Sue and her parents had any intention of taking the child at some later time, certainly there would have been some arrangement made with the Home for its keep and how long it would be left there before being taken to the Harvey home. On the contrary, nothing of this sort took place. To be sure Bonnie Sue testified that she thought she could make a settlement with the Home at some later indefinite date when she might see fit to take the child. This, in our judgment, is a weak explanation of her failure to make any arrangements at the time she left the Home or to later communicate with the Home in regard to the care of her child. We, therefore, can reach no other conclusion than that on the 8th day of May, 1951, Bonnie Sue Harvey left the Roselia Foundling Home with the settled purpose to forego all parental duties for her child and relinquish all parental claims. We further find as a fact that Bonnie Sue persisted in this purpose until December 27, 1951 when she first indicated to the officials of the Roselia Home any definite intention to the contrary. We wholly reject her testimony and the testimony of her witnesses that she made several calls to the Roselia Home in the meantime. Sister Miriam Teresa has testified that she never talked to Bonnie Sue prior to December 27, 1951 and she further states that so far as she knows no message was ever left at the home for her. She is corroborated in her testimony by the social worker, Miss Kearns, who, all during that period, was in the employ of the Home."

It is true that the court below improperly rejected certain corroboratory testimony offered by Bonnie Sue's mother, father, aunt, uncle, and brother. If this testimony were a vital factor in the case, we would

be obliged to return the Record to the court below for a reconsideration of all the admissible evidence and a new finding of fact. In no event is this Court free in reviewing a case on certiorari to "balance" conflicting declarations and make a conclusion on credibility. The adoption statute explicitly assigns this task to the judge who sees and hears the witnesses. However, I am convinced that it would be pointless to remand the present Record. All the testimony in question was heard by the judge and rejected as incompetent only after full consideration. Apart from the question of admissibilty, Judge Mook clearly indicated that he *disbelieved* this testimony when he said, immediately following the statement of his reasons for holding it incompetent: "The wisdom of this rule is clearly illustrated in the present case." Furthermore, he categorically rejected other testimony given by Bonnie Sue on points which were corroborated by testimony admitted by the court below. The credibility of the mother was the touchstone of the entire case. It would be illogical to disbelieve most of what she said and base the crucial finding of fact on other portions of her testimony. *Falsus in uno, falsus in omnibus.* Finally, it will be observed from a reading of the opinion that the court below placed considerable reliance on objective facts which indicated Bonnie Sue's intention to abandon. The probative value of these facts would be unshaken by the declarations which the court below rejected.

Since the issue before the hearing judge was solely one of credibility, with ample testimony to support his findings of fact, I would affirm the decree.

Mr. Justice CHIDSEY joins in this dissenting opinion.