**Termination of Parental Rights of W. M.**

*Thomas M. Painter,* for petitioner.
*J. Edward Beck,* for respondent.

KELLER, J., January 29, 1974.—Counsel for B. H. presented her petition to terminate the parental rights of her former husband in their son, M. M., on May 7, 1971, and an order was signed the same date setting the matter down for hearing on June 15, 1971, and further ordering that a true and attested copy of the petition and order be served on the respondent-father, W. M., by the sheriff. The respondent-father appeared with counsel at the scheduled hearing on June 15, 1971, and a continued hearing on June 17, 1971, to contest the termination proceeding. At the conclusion of the continued hearing, it was agreed that the testimony would be transcribed and the matter put down for argument.

On July 15, 1971, W. M., respondent in the case at bar, filed a petition for a writ of habeas corpus seeking visitation rights with his son, M. M. On the same date, an order was signed directing the issuance of the writ and setting July 20, 1971, for a hearing on the petition.

Hearing was held as ordered and a temporary order was entered placing primary custody of the child in the mother, and granting limited visitation rights to the father. The order specifically provided: "The institution of this proceeding and the decision hereon shall have no effect on the pending termination proceeding."

On stipulation of B. H. and W. M., this court entered an order on September 9, 1971, requiring W. M. to pay $22 per week for the support of M. M.

On May 15, 1973, the court reporter filed her transcript of the testimony taken on June 15 and 17, 1971, and notified counsel for the parties that it had been lodged in the office of the clerk of the court. The court certified the transcript to be the official transcript on August 21, 1973.

On August 10, 1973, B. H.'s petition to terminate or modify the visitation order of July 20, 1971, was presented and an order was signed the same date setting September 7, 1973, as the time for hearing on the petition. On August 29, 1973, W. M.'s petition to reopen the testimony in the case at bar was presented, and a rule to show cause was granted, returnable 15 days after service. By agreement of counsel for both parties, both of these matters were continued generally.

On December 7, 1973, the court heard arguments of counsel:

a. Whether the evidence taken at the June 15 and 17, 1971 hearings should be opened to permit the respondent-father to introduce evidence of his activities since those dates allegedly relevant to the termination proceeding.

b. Whether the parental rights of W. M. should be terminated on the basis of the evidence introduced at the June 15 and 17, 1971, hearings.

## FINDINGS OF FACT

1. Petitioner, B. H. and respondent, W. M., were married on August 28, 1965.

2. A child, M. M., was born to the marriage on April 4, 1966.

3. Petitioner and respondent separated in September 1969, and petitioner took the child with her and moved away from respondent.

4. The marriage of petitioner and respondent was terminated by divorce on February 4, 1970.

5. Petitioner married R. H. on April 1, 1970.

6. On November 14, 1969, petitioner and respondent entered into an agreement authorizing this court to enter an order awarding primary custody to petitioner with visitation rights in respondent between the hours of 1 p.m. and 5 p.m. on alternating Sundays, respondent to pick up and return the child to the home of petitioner's parents.

7. Pursuant to the said agreement, this court signed the order providing for primary custody and visitation on November 24, 1969.

8. M. M. resided with his natural parents from his birth on April 4, 1966, until their separation in September 1969. Thereafter, he made his home with his mother.

9. Petitioner and respondent in October of 1969 entered into an agreement requiring respondent to pay, via the Domestic Relations Office, $15 per week for the support of the child, commencing October 27, 1969. No order was ever signed by the court requiring the support agreed upon.

10. Respondent was relatively punctual in making payments to the Domestic Relations Office pursuant to the agreement, though it appears he would from time to time miss one or more weeks and then make them up.

11. Respondent's check dated July 31, 1970, in the amount of $30 was returned to the Domestic Relations Office marked "insufficient funds". Respondent made the check good on September 22, 1970.

12. On September 22, 1970, respondent also made his last support payment of $50.

13. The Domestic Relations Office on September 22, 1970, returned the "insufficient funds check," forwarded a bond for signature by respondent and advised that the child was going to be adopted. Respondent did not respond.

14. Petitioner caused a pending support proceeding to be dismissed on December 2, 1970.

15. Petitioner made respondent's visitation privileges with the child conditioned upon whether support payments .were current as of the scheduled visitation day.

16. Respondent on a few occasions did not attempt to exercise his visitation rights on scheduled visitation days and did not notify petitioner.

17. On occasions through the end of the summer of 1970 respondent attempted to call petitioner to discuss visitation or inquire about his son, and petitioner either declined to engage in fruitful conversations or her parents would not call her to the telephone.

18. Respondent did exercise visitation rights with his son; but due to petitioner's refusals arising out of nonpayment of support, respondent's occasional failure to visit, and petitioner's refusal to communicate with respondent, the parties became thoroughly confused as to which Sundays were visitation days. As a result of this confusion, there were times when petitioner did not have the child at her parents' home for respondent to pick up when he came, and other times when respondent did not come for the child when he was there and waiting.

19. Respondent's last visit with his son was at the end of July or beginning of August 1970.

20. In July or August 1970, respondent was refused his visitation rights with his son. Petitioner's husband then inquired if respondent would be willing to give his son up for adoption, and respondent said, "No".

21. Later in the summer of 1970, petitioner's husband told respondent he did not want his money. He again asked respondent to give up his son for adoption, and he again was refused. The husband then said, "Well, we will see what we can do about it."

22. Respondent discontinued his efforts to see his son after August 1970, because he was discouraged by the repeated refusals and hostility of petitioner.

23. Respondent attempted to secure information about his son from mutual friends of the parties.

24. Subsequent to the separation of the parties, but prior to their divorce, petitioner stated that she did not want respondent to ever see his son again.

25. In an effort to have his son receive something from him for Christmas in 1970, respondent arranged to have his name, along with names of other members of his family, signed to a Christmas card to his son in which he enclosed $5. The card was then delivered by respondent's mother to petitioner's mother for delivery to the child.

26. Contrary to her statement that she would deliver the card to the child, petitioner's mother notified petitioner that she had the card, and on petitioner's instruction opened it and read it to her. The card and $5 were delivered to petitioner.

27. Petitioner returned the card and $5 to respondent's mother with a note, which indicated the child was happy and she did not want him to have anything more to do with the past. Petitioner explained that she did not want him to have any contact with his real father or anyone in the father's family.

28. Respondent made no further efforts to enforce his right to visitation under the order of November 24, 1969, and explained this failure on the grounds that he could not afford to retain counsel.

29. Respondent did not send any birthday gift or card to his son and justified this omission on the grounds that either gift or card would be returned by petitioner as she had returned the Christmas card and money.

30. Respondent testified to:

(a) his love for his son;

(b) his desire to exercise visitation rights with him;

(c) his willingness to support him;

(d) his lack of intent at any time to give up his son.

31. From the time of the parties' separation, petitioner actively engaged in efforts to frustrate the visitation rights of respondent and to encourage him to discontinue his interest, and abandon his parental rights in his son.

32. Respondent at no time intended to abandon his parental rights in his son.

## DISCUSSION

Respondent contends that the record should be opened to permit him to introduce evidence that he has exercised his right to visit with his son as permitted under the order of July 20, 1971, and has paid support for his son as required under the order of September 9, 1971. Petitioner vigorously urges us to reject respondent's effort to open the record on the grounds that whatever he did subsequent to the termination hearing is irrelevant, because the only material issue is whether the father's action or inaction prior to the hearing constituted a legal basis for the termination of his rights in his son. Petitioner also argues that it was not her fault that it took almost two years for the record to be transcribed, and that she did bitterly resist the grant of visitation rights. The court feels, as a matter of justice, we must note our statement in the order of July 20, 1971, "The institution of this proceeding (i.e., the habeas corpus proceeding) and the decision hereon shall have no effect on the pending termination proceeding."

"Abandonment is not an ambulatory thing the legal effects of which a delinquent parent may dissipate at will by the expression of a desire for the return of the discarded child. We do not mean to say that the natural parental right to a child, which has been nullified by abandonment, may not later be retrieved. It may be. But, as the parent's consent to an adoption is no longer necessary, once abandonment has been proven with required legal sufficiency, the welfare of the abandoned child is the primary and paramount concern of the court unaffected by the desire or caprice of the abandoning parent": Davies Adoption Case, 353 Pa. 579, 587 (1946). See also Adoption of Stone Minors, 58 D. & C. 2d 759, 766 (1973).

We conclude that the rights of respondent as father of M. M. must be determined on the basis of the evidence introduced at the hearings held June 15 and 17, 1971. To hold otherwise would have the effect of assuring a neglectful parent that they would have the right to change their mind at the courthouse door. We cannot perceive any advantage to such a rule, only disadvantage to the children. We, therefore, deny respondent's petition to open the record.

There now remains the ultimate issue whether the evidence introduced at the June 15th and 17th hearings was sufficient in quantity and quality to justify a termination of the parental rights of W. M. in M. M. To determine this ultimate issue, it is essential for the court to determine what law must be applied to the facts found.

The question which law is applicable to the case at bar is peculiarly critical because the Adoption Act was adopted by the legislature on July 24, 1970, to become effective January 1, 1971, 1 PS §603; and section 311, 1 PS §311, substantially enlarges the grounds for involuntary termination of the rights of a parent

as compared with the Act of April 4, 1925, P. L. 127, 1 PS §1, et seq., as amended. Petitioner contends that the new and more liberal section applies, despite the fact that the six-month period would be computed from May 7, 1971, and thus extend back in time beyond the effective date of the new act. Not surprisingly, respondent urges that his conduct must be measured against the requirements of the 1925 Act because his conduct under the new act only continued for four months and seven days, i.e., from January 1, 1971 to May 7, 1971.

The applicable provisions of the Act of 1925, P. L. 127, as amended, provides:

" 'Abandonment' means conduct on the part of a parent which evidences a settled purpose of relinquishing parental claim to the child and of refusing or failing to perform parental duties." Section 1.

"Consent to the adoption is necessary as follows: . . .

"(c) The consent of a parent . . . who has abandoned the child, for a period of at least six months, shall be unnecessary, provided such fact is proven to the satisfaction of the court or judge hearing the petition, in which case such court or judge shall so find as a fact": Section 2(c).

Section 1.2 of the Act of 1925, 1 PS §1.2, establishes a procedure available to approved institutions or agencies having the care of a child for 30 days, whereby they may establish parental abandonment for a period of at least six months and secure a judicial determination of abandonment and an award of custody.

The applicable provisions of the Act of July 24, 1970 P. L. 620 (No. 208), 1 PS §312, et seq., provide:

Section 312: "A petition to terminate parental rights with respect to a child under the age of

eighteen years may be filed by (1) either parent when termination is sought with respect to the other parent."

Section 311: "The rights of a parent in regard to a child may be terminated after a petition filed pursuant to section 312, and a hearing held pursuant to section 313, on the ground that: (1) The parent by conduct continuing for a period of at least six months either has evidenced a settled purpose of relinquishing parental claim to a child, or has refused or failed to perform parental duties."

Section 601: "(a) The act of April 4, 1925 (P. L. 127), entitled 'An act relating to Adoption', is hereby repealed absolutely. (b) All other acts and parts of acts are repealed in so far as they are inconsistent herewith."

Section 602: "(a) This act shall apply to all proceedings begun on or after January 1, 1971. (b) Adoption proceedings in progress and not completed before the effective date of this act may be amended after January 1, 1971 to conform to this act if the parties in the particular case shall so agree. Otherwise, such proceedings shall be carried to their conclusion under the Act of April 4, 1925 (P. L. 127), entitled 'An act relating to Adoption'."

Section 603: "This act shall take effect January 1, 1971."

The major procedural difference in the here applicable sections of the two acts is that the 1970 Adoption Act specifically authorizes one spouse to initiate an involuntary termination proceeding against the other; whereas, under the 1925 Act such a proceeding was only available to approved institutions and agencies. The substantive difference here applicable between the two acts lies in the 1925 Act requiring for involuntary termination six months of intent to relinquish parental claim to the child *and* the refusal

or failure to perform parental duties; whereas, under the 1970 Act evidence of the six months intent to relinquish *or* the refusal or failure to perform is sufficient.

In an effort to resolve the conflicting contentions of the parties, we have turned to the Statutory Construction Act of May 28, 1937, P. L. 1019, 46 PS §501, et seq. The following sections are pertinent to the issue here under consideration:

Section 552: "In ascertaining the intention of the Legislature in the enactment of a law, the courts may be guided by the following presumptions among others:

"(1) That the Legislature does not intend a result that is absurd, impossible of execution or unreasonable."

Section 556: "No law shall be construed to be retroactive unless clearly and manifestly so intended by the Legislature."

Section 311, supra, effected a substantial change in the law governing the termination of parental rights by reason of abandonment. When this substantial change is translated into its practical effect upon parental rights and the potential loss of them, it means a parent may now lose his rights in his child for less reason than he could before January 1, 1971. In this context, we conclude:

1. It would be unreasonable to hold W. M.'s parental rights could be affected by the provisions of Section 311(1) before that section became legally effective.

2. In the enactment of the Adoption Act of 1970, the legislature gave no indication of an intention to make any part of the act effective prior to January 1, 1971.

We, therefore, conclude that petitioner's right to

have respondent's parental rights terminated must be determined under the Adoption Act of 1925.

In Rettew Adoption Case, 428 Pa. 430, 433 (1968), the Supreme Court held:

"That rule, as proclaimed in the Adoption Act of April 4, 1925 (P. L. 127, §1, as amended, 1 P.S. §1(a)), and as set forth by this Court in many cases, such as Hunter Adoption Case, 421 Pa. 287, 292, is that a child may not be taken from a parent through adoption proceedings unless it is demonstrated 'that the parent intended to give up the child absolutely, never to claim it again, and that this intention was manifested for a period of at least six months.' "

In Hangartner Adoption Case, 407 Pa. 601, 604 (1962), the Supreme Court addressed itself to the judicial philosophy to be applied in cases involving termination of parental rights in the following eloquent language:

"In our approach to this problem we bear in mind that which Chief Justice Stern stated in Harvey Adoption Case, 375 Pa. 1, 3, 4, 99 A. 2d 276: 'Proceedings for the adoption of a child must be carefully differentiated from those involving merely a question of its custody; they are of far greater importance and involve more serious consequences. Custody may be awarded for a more or less temporary duration, but a decree of adoption terminates forever all relations between the child and its natural parents, severs it entirely from its own family tree and engrafts it upon that of its new parentage: Schwab Adoption Case, 355 Pa. 534, 536, 50 A. 2d 504, 505. For all purposes, legal and practical, the child thenceforth is dead to the [parent]; [the parent] has lost the right ever to see [his or her] child again or even to know of its whereabouts. Because, therefore, of these direful

results of an adverse adoption proceeding the rights of the natural parent should not be terminated unless the record clearly warrants such a decree: Southard Adoption Case, 358 Pa. 386, 392, 57 A. 2d 904, 907'."

In Jones Appeal, 449 Pa. 543, 547 (1972), the Supreme Court reversed the lower court's termination of a mother's rights in her children where she had pled guilty to aiding and abetting the rape of her 14-year-old daughter by her paramour. The involuntary termination proceeding was brought under the more liberal Act of 1970, and the court held:

"While the new Adoption Act must be viewed as an expansion of the courts' powers to terminate parental rights under the proper circumstances, the statutory standard of evidence necessary to support termination is nonetheless demanding. The legislative enactments demonstrate that the courts should not disturb the parent-child relationship in the absence of compelling evidence of 'repeated and continued incapacity, abuse, neglect or refusal' to provide essential parental care."

Applying the law to the facts in the case at bar, we conclude that petitioner did not sustain the burden of proving that respondent for a period of six months intended to relinquish his parental rights in the child.

## ORDER

Now, January 29, 1974, respondent's petition to open the evidence is denied, and petitioner's petition to terminate the parental rights of the respondent is denied.

Each party to pay his or her own costs.

Exceptions are granted petitioner and respondent.