## Keich's Petition

*Arthur E. Ricchiuti*, for petitioner.

*Frank Gallagher*, for George Wheat, Sr.

GANGLOFF, P. J., October 14, 1946.—This is the petition of Robert George Keich for the adoption of George Wheat, Jr., minor son of his wife, Louise D. Keich, by a former marriage. From the record and the testimony we find the following facts:

Petitioner is a native born citizen of the United States of America, aged 26 years, presently a staff sergeant in the United States Army, with about seven years' service to his credit, living with his wife and the child he desires to adopt at Copeland Park, Newport News, Va., where he is presently stationed. The home of petitioner is Tamaqua in our County of Schuylkill; he married the child's mother on April 14, 1946, since which date the child has formed part of his family and has been supported and maintained by him. Petitioner is undoubtedly a fit person and qualified in all respects to become the adoptive father of the child he desires to adopt. George Wheat, Jr., the child petitioner desires to adopt, was born on April 19, 1941, at the Locust Mountain Hospital, Shenandoah, in our County of Schuylkill, and is the child of George S. Wheat and his then wife, Louise D. Wheat, now petitioner's wife. The father of the child instituted divorce proceedings in our court of common pleas to no. 192, November term, 1944, against his wife, the child's mother, alleging as grounds for an affirmative decree "cruel and barbarous treatment and indignities to the person". Our examination of the records in that proceeding shows that no defense was entered. A decree of divorce was entered by the court on March 5, 1945.

The mother consents to the proposed adoption but she desires to retain her rights as natural mother. Of course, her consent, so limited, meets legal requirements; see section 16(b) of the Intestate Act of 1917. The father of the child refuses to consent to the proposed adoption. He appeared with counsel at the hearing, testified in his own behalf and actively opposed the prayer of petitioner. It is not contended, nor would the testimony support the contention, if made, that the child's welfare would be affected adversely if the prayer of petitioner were granted. The contention of petitioner and his wife is that the natural father aban-

doned the child. The natural father denies this. The sole issue here is, therefore, whether or not the natural father abandoned the child, for if he did then his consent to the proposed adoption is not required; see section 2(c) of the Adoption Act of April 14, 1925, P. L. 127, as amended by the Act of July 2, 1941, P. L. 229. It may be well to emphasize that the issue here is not the custody of the child, as would be the case in habeas corpus proceedings. Were that the issue, the welfare and interest of the child would be the principal matter to be considered. Here the welfare of the child is not sufficient ground for the decree of adoption unless based on the necessary consent of the natural father, or on the distinct finding that the latter has abandoned his child. The fact that the adoption asked for may be advantageous to the child and for his material welfare is not to be considered by the court until the necessary prerequisites, as fixed by the statute, exist: Petition of Sulewski et al. 113 Pa. Superior Ct. 301.

The natural parents of the child proposed to be adopted were married on January 27, 1939. They separated about July 15, 1944, the child remaining with the mother. The child has lived with the mother since the separation. Each parent sought legal advice. The decree of divorce followed but the question of custody of the child was not presented to any court for disposition. On the contrary, under advice of counsel, the parents of the child did, on October 21, 1944, enter into a written agreement, the original of which is part of the testimony here, wherein they state the reason for the agreement to be: "Whereas, the parties hereto are desirous of determining the present and future right of custody of said minor child" and they then therein agree:

"That the mother shall be entitled to the custody of the aforesaid son during his minority; subject, however, to the right of the father to have possession and

custody of said son every weekend and throughout each year, receiving custody of said minor child at the home of the mother, at or about four o'clock, p. m., Friday, and returning said child to the home of the mother on the following Sunday at five o'clock p. m."

Certainly, the terms of the agreement between the child's parents do not connote abandonment by the father of his child; on the contrary, the terms of that agreement plainly indicate an intent to retain his legal rights as a parent of the child and this is so notwithstanding no mention is made of his obligation to support the child. For the period of approximately six months following the date of this agreement the father did have custody of the child over weekends except for several times when the child was ill with whooping cough. The parents lived about seven miles apart and the practice seems to have been for the father to telephone to the home of the mother's mother, with whom she and the child lived, and ascertain whether the child would be turned over to him. Custody of the child over weekends seems to have been obtained by the father without difficulty until a short time after the decree of divorce was obtained by the father. No doubt the change of status of the parents produced by the divorce brought in its trail a change of attitude of each toward the other. Disputes seem to have arisen with the result that about the middle of April 1945 the weekend visits of the child with his father ended and have not resumed since then. Since these weekend visits ended the father has had the child but once; this was on V-E day in May 1945, when the mother, while visiting across the street from the father's home, allowed the child, unaccompanied, to go to the father across the street; he remained with the father about 15 minutes. Since the latter visit the father, according to his own testimony, saw the child but once, namely, in July or August, 1945, in Mahanoy City, when, he

claims, he handed the child a $1 bill. The child was at the hearing and, of course, the father then again saw the child.

The father of the child claims that custody of the child over weekends, in accordance with the terms of the written agreement of October 21, 1944, ended because the mother told him over the telephone the latter part of April 1945 that he no longer could have custody of the child over weekends. The mother denies this.

Up until the decree divorcing the parents was entered the father supported the child. This is admitted by the mother. Thereafter, until the latter part of April 1945 the father sent to the child's mother $5 per week for his support. This also is admitted by the mother. The father contributed nothing toward the support of the child since the latter part of April 1945 except the $1 already referred to. The father admits the truth of this but he claims the reason for his failure to continue these weekly payments is because the child's mother would no longer accept his money. She denies this.

Of course, it is only trite to say that this contradictory testimony on the part of the father and mother of this child warrants the view that one of the two has not told the whole truth. We have read the testimony filed in the divorce proceedings. To have continued living together, as husband and wife, under the conditions disclosed by that testimony, would have been very detrimental to the welfare of the wholly innocent child here involved. But the causes which resulted in the divorce are of interest here only in the sense that they give us some light on the feelings which these parents seem to have toward each other. So we have the wholly contradictory statements from them upon the question of support of the child since April 1945 and upon the question of weekend custody of the child from the same date. And yet support and custody have

such a material bearing upon the question of abandonment that something better than a guess must be formulated as our guide in solving the primary issue in the case.

What constitutes abandonment? It is defined in Weinbach's Appeal, 316 Pa. 333, 339, thus:

" 'The statutory notion of abandonment does not necessarily, we think, imply that the parent has deserted the child, or even ceased to feel any concern for its interests. It fairly may, and in our judgment does, import any conduct on the part of the parent which evinces a settled purpose to forego all parental duties and relinquish all parental claim to the child. Such a purpose, clearly manifested, certainly forms a more reasonable ground for permitting judicial discretion to decide whether another may assume these claims and duties than does the signature of the parent, which a mere impulse may induce. It does not follow that the purpose may not be repented of, and in proper cases all·parental rights again acquired, including this statutory right of preventing adoption by withholding consent; but, when once the abandonment is shown to have existed, it becomes a judicial question whether it really has been terminated or can be, consistently with the welfare of the child. When, in pursuance perhaps of the abandonment, new ties have been formed and a new station in life has been taken by the child, it might be unjust that, solely because of the parent's caprice, legal sanction should be refused to the new conditions. Under such circumstances, a court might lawfully deem the abandonment irrevocable, so far as the claims of the parent were concerned."

This view of abandonment is repeated in Hazuka's Case, 345 Pa. 432, and again in Davies Adoption Case, 353 Pa. 579.

Now, it must be obvious that abandonment includes not only "a settled purpose to forego all parental duties" but also a settled purpose to "relinquish all

parental claims to the child". Upon the question of parental duties we have some testimony which aids materially in molding a correct conclusion. On March 14, 1946, one month before the marriage of the mother of the child to petitioner, she wrote a letter to her former husband in which she said:

"If you will be so kind as to pay the charges still held against this decree (divorce), I will be glad to sign any agreement to relinquish all claim for support for George, Jr."

Certainly the present adoption proceedings were not in contemplation when this letter was written; the mother did not marry petitioner until a month later. The decree of divorce awarded the costs to libellant. The letter asks the latter to pay the costs and as an incentive for such payment the mother agrees to carry the burden of supporting the child. No doubt, she then had in contemplation the marriage to her present husband. At any rate, our examination of the docket entries in the divorce proceedings shows that the very next day, March 15, 1946, counsel for the husband entered satisfaction of the costs upon the docket. In the absence of specific testimony, it is entirely reasonable to infer that the request made by the child's mother in her letter of March 14, 1946, was complied with, and the further inference fairly follows, namely, that the mother alone thereupon undertook to support the child. Whether this relieved the father of his legal obligation to support the child need not be decided here. What we are concerned with is whether there is a satisfactory explanation of why the father did not support the child. This letter gives us one explanation. The second marriage of the child's mother furnishes another. And since no testimony was offered to show a demand, other than the letter above mentioned, upon the father by the mother, for support of the child, during the period after April 1945, we may fairly assume that such demand was not made. These facts and circumstances

viewed as a whole hardly warrant the conclusion that they show conduct on the part of the father "which evinces a settled purpose to forego all parental duties". His present position upon this question of support is summed up by him in his testimony thus:

"Q. You have no intention as the father of the child to provide for him?

"A. Under the circumstances, no. I was not allowed to."

There are situations where "conduct speaks louder than words." Where, as here, the testimony is contratory and the contradictions come from but two witnesses, we must test the testimony in the light of the conduct of both witnesses. That test does not, in our judgment, warrant a finding that the fair preponderance and weight of the evidence points to a settled purpose on the part of the father "to relinquish all parental claims to the child".

If the welfare of the child were our sole consideration here we would not hesitate, in view of the remarriage of the mother and the fine character of her present husband, to act affirmatively upon the prayer of the petition. But, as already mentioned, that is not the only criterion to follow. Abandonment must be "clearly manifested" and we cannot in conscience say, under all the evidence in this case, that the conduct of the natural father clearly manifests abandonment as defined for us by our Supreme Court. For cases similar to this one, in which the court reached the same conclusion as we do here see Adoption of Nora Edith Espenshade, a Minor, 55 Dauph. 399, Seidel's Adoption, 23 D. & C. 221, and McGill's Adoption, 49 D. & C. 374; see also, Forst's Adoption, 12 D. & C. 739, Andrew's Adoption, 14 D. & C. 343, and Welker's Adoption, 50 D. & C. 573.

Petitioner married the child's mother just six months ago. That represents the total period during which the child has lived with his stepfather. As was said in

McGill's *Adoption, supra,* it seems that the petition in this case was presented somewhat prematurely. The child was in court at the hearing. That his natural father did not appear as a stranger to him was plainly to be seen. We believe we may be within the proprieties when we express, for the child's sake, the hope that an amicable solution of the child's future status may be forthcoming promptly. In the meantime, under the evidence, we must decline to enter a decree as prayed for.

And now, October 14, 1946, the court declines to enter a decree of adoption as prayed for but without prejudice to the right of petitioner to renew his application at some appropriate future time when the circumstances may have changed.