## Young Adoption Case.

Argued March 20, 1959. Before JONES, C. J., BELL, MUSMANNO, JONES, COHEN, BOK and McBRIDE, JJ.

*Barney Phillips,* for appellant.

*John A. Metz, Jr.,* with him *George F. Young, Jr.,* and *Metz, Cook, Hanna & Kelly,* for appellees.

OPINION BY MR. JUSTICE MUSMANNO, May 8, 1959:

This case presents the paradox of a father who ignores his child's birth, neglects his existence, fails to support him, never visits him, sends him no letter, card, toy, or present, displays not the slightest sentiment toward him, does not inquire about his health or well-being, comes into the town where the child lives and departs without even asking about his whereabouts—and then, when the child is about to be adopted by persons who love and cherish this forsaken creature of humanity, steps in to object, protest, and complain. The fact that he did go into court to register his claim lends verisimilitude to the sincerity of a protest which might otherwise be interpreted as an attitude of *canis in praesepi.*

The case reaches this Court on appeal from the Orphans' Court of Allegheny County which decreed adoption of the child, Edward Young (21 months of age) by Thomas E. Landy and Constance Landy who had petitioned for adoption on August 29, 1957, after the child had been placed in their custody by the Juvenile Court of Allegheny County with the consent of the mother, Mrs. Mary Woomer Young, and on the assumed abandonment of the child by the father, Ralph Young. At the hearing before the orphans' court, the following narrative of facts emerged.

Ralph Young and Mary Woomer were married in 1946 and are the parents of five children in all, Edward, (born on June 26, 1956) in Pittsburgh, being the youngest. In the latter part of 1953, Ralph Young, after installing his wife and then four children in the home of his wife's mother (Mrs. Margaret Woomer), set out for California without informing his family as to his intentions. For a year and a half he did not communicate with his wife or children, nor did he send them money, clothing, or food. At the hearing in orphans' court he explained that he could not afford to send the family any maintenance because he was earning only $240 per month and he needed this money for his own maintenance. Although, the cost of living was high then, as it still is, the United States Government had not yet increased the cost of postage, so that it is difficult to believe that with $240 coming into his pocket every month, Mr. Young could not have purchased a three-cent stamp with which to send his family a letter to appease, if not their hunger for food, at least their spiritual need for news as to what had happened to him.

Since the children were all of tender age, Mrs. Young could not work at a full-time job, but she did work part time and, with help from a Mothers' Assistance Allow-

ance from the Department of Public Assistance of the Commonwealth of Pennsylvania, she managed to keep herself and her brood afloat on the husbandless-fatherless sea. When the financial storm became too severe, the children were given refuge in the St. Paul's Orphan Asylum.

Finally, in May of 1955, the errant husband found a postage stamp and communicated with his wife. Almost immediately Mrs. Young packed her children on to a bus and started for the Pacific Coast, paying for the transportation herself. She joined her husband, and the reunited family established a home in Hemet, California. Although he was now earning $80 a week, he still induced his wife to cash her insurance policy so that he could get $200 with which to make a down payment on an automobile. In this automobile he brought his family back to Pittsburgh in September, 1955, and once more lodged them in his mother-in-law's home. Three days later he started west again. Before he managed to quit his home town jurisdiction, however, his wife exercised sufficient foresight to initiate support proceedings in the County Court of Allegheny County which court entered a support order on him for $25 per week.

Prior to their eastward trip back from California, Mrs. Young informed her husband that she was pregnant. Aside from indulging in some profanity at hearing the news, Mr. Young made no further reference then or later to the subject, even though Mrs. Young again called his attention to the anticipated problem of another child when she wrote to him after he had departed for California from Pittsburgh.

Returned to California, Mr. Young again found difficulty in purchasing postage stamps, even though he was now earning $85 per week. He wrote his wife no letter nor did he seek any information from anyone

about the fifth child on the way. That child arrived, as before stated, on June 6, 1956, the lying-in expenses being paid by the Department of Public Assistance of Pennsylvania. In the meantime, however, Mrs. Young's health was such that she could not care for the four children; the Juvenile Court of Allegheny County stepped in, declaring them neglected and dependent, and once more they went to the St. Paul's Orphans Asylum.

When baby Edward entered the World, Mrs. Young's economic problems intensified, her health worsened, and her mother felt the need to petition the juvenile court to have young Edward also adjudicated neglected and dependent. Since Mr. Young was still maintaining the silence of Enoch Arden, Mrs. Young certified on July 13, 1956 that she consented to giving up Edward for adoption.

On July 17, 1956, the juvenile court wrote Ralph Young advising that a hearing was scheduled for August 1, 1956, on the subject of adoption and asking for his views. Although the letter was mailed on July 17th, Ralph Young did not reply until July 29th at which time he said he did not consent to adoption proceedings. He made no request for postponement of the hearing so that he could be present, he employed no counsel to represent him, he did not even ask his mother or father in Pittsburgh to make inquiry as to the status of his child and what was happening. And, needless to say, he sent no money for Edward who was now placed in the Roselia Foundling and Maternity Hospital for seven months and then given to the Landys on February 18, 1957, in anticipation of the adoption proceedings.

At the hearing before the orphans' court, Mr. Young complained that the juvenile court was to be blamed for his absence at the hearing of August 1, 1956, because the letter they mailed on July 17, 1956, had been sent first class instead of air mail. This is cutting blocks

with a razor. Even travelling by railroad, the letter would have arrived in California in no more than three or four days so that Ralph Young knew by July 21st what was transpiring in Pittsburgh about his baby. It would appear that although he complained because the juvenile court used only a three-cent stamp, he himself again found difficulty in locating a post office since he did not reply to the juvenile court letter until July 29, 1956.

On August 13, 1956, the juvenile court informed him of the status quo and Ralph Young again withdrew into his well-furnished cave of silence. Although beginning with July 1, 1956, Young was earning $6600 a year, his aversion for the United States Post Office continued. He sent no money order to Pittsburgh for his son's maintenance.

In November, 1957, he came on to Pittsburgh for a visit. The indifference which distance had apparently fomented was not abated by geographical proximity because while in Pittsburgh he made no effort to see his helpless offspring, he made no attempt to obtain custody of him, and he extended no hand in financial or other support.

Once more back in California, Mr. Young, on January 25, 1958, wrote to the Juvenile Court of Allegheny County stating that he would like to have his four older children with him and if this could be arranged he would have his mother-in-law come on to take care of them. However, in this letter he made no inquiry about Edward. Mrs. Rita Molinaro of the staff of the juvenile court testified: "Q. Now, Mrs. Molinaro, in that letter there is no mention whatsoever of the child Edward, is that correct? A. No, there is not. Q. In that letter the father stated last fall he was in Pittsburgh. At any time did he appear at Juvenile Court, inquirying as to the whereabouts of Edward? A. He did not. Q. From

April of last year, when you took over the case, at any time did he appear at Juvenile Court and inquire as to the child? A. No, he did not. Q. Did he ever send anything of value or any support toward the child, to Juvenile Court? A. No, he did not. Q. Did he inquire as to the health of the child at Juvenile Court? A. No, he made no inquiry whatsoever."

If Mr. Young had deliberately planned to ignore his child and its welfare, it is doubtful that he could have been more successful in achieving his objective than he was able to accomplish through forced inattention, deliberate indifference, and ever-intensifying inertia. Even, after being notified of the final adoption proceedings, scheduled for February 27, 1958, he still failed to make an appearance, although he did have his mother employ an attorney who asked for a postponement of the hearing. After taking some testimony, the court continued the hearing until March 27, 1958, when Mr. Young at last, and for the first time, announced that he was willing to assume responsibility "financially and otherwise" for the rearing of his son, Edward. But the statement of assumption of responsibility was not too convincing. He was asked by his attorney: "And what arrangements have you made with your mother concerning such support and caring for the children?" He replied: "She has *agreed* to come to California and *help* establish a home. In other words, she will be there *part of the time,* and I *intend* to *hire some one part time* to help her." (Emphasis supplied.)

On such an ambiguous and doubt-crested sea would Mr. Young launch the career of his theretofore-neglected 20-month-old Edward and his equally neglected little brothers and sister. To take tiny Edward away from the Landys who have an excellent home and for over a year have cared for Edward as if he were their very own, and send him out to the West under the care of

an errant, footloose, carefree father and a grandmother who did not even testify that she would go to live with her geographically distant and taciturn son to manage and supervise a yet non-existent home, would be for the Court to throw prudence, experience, and sagacity to the very winds.

However, even if we were to assume that Mr. Young's belated declaration of attachment to his child is sincere, he still may not have him. This is not a matter of punishment to a father for his past sins; it is a matter of concern for the child's present welfare and its future well-being. The life of a tender child may be so damaged by neglect that no amount of contrition on the part of the redeeming parent can repair, mend, or heal the hurt. As Chief Justice JONES excellently expressed it in the *Davies Adoption Case*, 353 Pa. 579, 587: "A child's natural needs for food, clothing and shelter demand that someone immediately assume the attendant responsibility which an abandoning parent has ignored; and, that responsibility endures constantly. It does not await the capricious decision of an uncertain parent, perhaps, years later."

Even though the parents later became as kind as angels, as benevolent as Samaritans, as strong as a mated Samson and an Amazon, and as rich as a male and female Midas, they still cannot undo what hunger, rough handling, and lack of hygiene may have wrought during the first year of a baby's life. Nor may a parent in the possession of his normal senses assert that he did not know the imperative and inexorable needs of a helpless infant.

The Legislature thus acted wisely in warning all parents that if for a period of at least six months they fail to supply the bottle of milk, the change of clothing, the cradle of comfort, and the counterpane of love which are the breath of life to an infant, they may be

confronted with the charge of abandonment of their child. And once the statutory limits have been passed and adoption is in the process of being effected, a thousand cradles will not win back the forsaken child.

"Abandonment is not an ambulatory thing the legal effects of which a delinquent parent may dissipate at will by the expression of a desire for the return of the discarded child. We do not mean to say that the natural parental right to a child, which has been nullified by abandonment, may not later be retrieved. It may be. But, as the parent's consent to an adoption is no longer necessary, once abandonment has been proven with required legal sufficiency, the welfare of the abandoned child is the primary and paramount concern of the court unaffected by the desire or caprice of the abandoning parent." (*Davies Adoption Case,* supra, p. 587)

The only issue in this case is whether Ralph Young abandoned his child for a period exceeding six months. (Act of June 30, 1947, P. L. 1180, §2, 1 P.S. §2).

The record is overwhelming in its proof that, as stated by the learned Court below, "the course of conduct of Ralph L. Young toward his child Edward from date of birth on June 26, 1956, to the date of the hearing on March 27, 1958 . . . is one of callous and irresponsible neglect of a dependent child. The testimony and the evidence . . . establish that Ralph L. Young failed and refused to perform his parental duties to the child and show a settled purpose to relinquish all claims to the child persisted in for over a period of six months."

However, if Ralph Young experiences disappointment in the decision which deprives him of the joy and pride of a father in raising a child born to his lawful wife, who was compelled to give her consent to the adoption because of his neglect of her, his disappoint-

ment need not be a continuing one since he can be assured that under the protection and ever-watchful eye of the adoptive parents, Thomas and Constance Landy, who are respectable, honest, God-fearing, home-loving, substantial, responsible citizens, Edward will have the care attention and love that the most devoted natural parents could bestow on him.

Decree affirmed at cost of appellant.