## Adoption of Stone Minors

*Henry L. Stuart,* for Child Welfare Services.
*Frances H. DelDuca,* for mother.

SHUGHART, P. J., January 8, 1973.—The Cumberland County Child Welfare Services filed a petition for the involuntary termination of the parental rights of Mrs. Betty Stone to her three children: Toni Lynn, Tina Irene and Carol Ann. The children have been in the custody of the Cumberland County Child Welfare Services since December of 1970 pursuant to an order of the juvenile division of this court based on a petition filed by a caseworker of the Cumberland County Child Welfare Services.

A hearing was set at which representatives of the petitioning agency and Mrs. Stone appeared and offered testimony. The testimony has been transcribed, the matter has been argued and is now ripe for adjudication.

From the testimony taken, we make the following findings of fact.

### FINDINGS OF FACT

1. Earl Leroy Stone and Betty Arlene Stone were married in March of 1966 and the marriage still exists. Of the marriage, three children were born: Tina Irene, born August 31, 1966; Toni Lynn, born January 19, 1968; and Carol Ann, born November 10, 1969.

2. In December of 1970, a petition was filed by a caseworker of the Cumberland County Child Welfare Services averring that the three children were neglected and/or dependent and an order was entered by the juvenile court on December 17, 1970, awarding custody of the three children to the Cumberland County Child Welfare Services.

3. Immediately prior to the children being placed in the custody of Child Welfare Services, they had resided with their mother, Betty Stone, at 62 West North Street where she resided with her paramour, Hoover Hurley.

4. On February 9, 1971, the Welfare Services received a letter from Betty Stone written January 31, 1971, in which Mrs. Stone indicated her intention to regain custody of her children. The letter failed to reveal Mrs. Stone's whereabouts but requested that communications be sent to her at the address of Mrs. Nellie Hurley (Hoover Hurley's mother) at 19 Wood Lane, Carlisle, Pa. The letter stated that Mrs. Hurley did not know her whereabouts but that she called Mrs. Hurley "once in awhile."

5. On February 17, 1971, a letter was sent by the Child Welfare Services to Betty Stone in care of Mrs. Nellie Hurley. This communication advised Mrs. Stone that if she was interested in getting her girls back she should immediately contact the welfare agency in Florida and they, in turn, could contact the local agency. Although denied by Mrs. Stone, it is found as a fact that she received this letter.

6. After the letter of January 31, 1971, Mrs. Stone next communicated with the Child Welfare office by letter of December 1, 1971, in which she gave

her address as "Friends Apt., Apt. 19, Clearwater Beach, Florida."

7. Child Welfare Services replied to this letter in a communication dated December 21, 1971, in which it was suggested that Mrs. Stone demonstrate her interest in the children by contributing to their support and further indicating that her continued silence would result in the assumption that she is no longer interested in the children and that steps will be taken to make permanent living arrangements for them.

8. After the letter in December of 1971, nothing further was heard from Mrs. Stone until after September 7, 1972, when she was given notice of the hearing on the present petition for involuntary termination of her parental rights.

9. Between December 21, 1971, and September 7, 1972, Betty Stone had no contacts of any kind with the Child Welfare Services nor any contacts with any of her children, sent no cards or gifts to any of the children, made no attempts to see the children or inquire of them, and contributed nothing toward their support.

10. Earl Leroy Stone, the natural father of the children, filed a petition with this court praying for relinquishment of his parental rights and duties with respect to the children, and on October 16, 1972, decrees were entered terminating all his rights with respect to each of the three children.

## DISCUSSION

Section 311 of the Adoption Act of July 21, 1970, P. L. 620, 1 PS §311, provides that the rights of a parent in regard to a child may be terminated involuntarily after hearing when:

"(1) The parent by conduct continuing for a period of at least six months either has evidenced a settled purpose of relinquishing parental claim to a child, or has refused or failed to perform parental duties; . . ."

At the outset, it must be noted that the mother of these three small children has had no direct contact with them at any time since they were placed in the custody of the Cumberland County Child Welfare Services on December 17, 1970, or more than two years ago. She attempts, in part, to explain her early failure to contact the children on the basis that the Child Welfare worker who removed the children from her care was antagonistic to her and told her that she could not see the children. The difficulty with this position is that at least as early as January 31, 1971, she was aware that the worker with whom she had had the difficulty had been replaced and that the worker assigned to the children was Susan Weiss about whose conduct toward her she had no complaint. Mrs. Stone denies that she received the communication written by Mrs. Weiss dated February 17, 1971, which was sent to her in care of Hoover Hurley's mother. It is interesting that in the January 31st letter Mrs. Stone states that Mrs. Hurley did not know her whereabouts; whereas, in her testimony at the hearing, she stated that Mrs. Hurley knew where she was and that she kept in good contact with her. We encounter no difficulty in reaching the conclusion that the communication from Child Welfare of February 17, 1971, did, in fact, reach Mrs. Stone and that thereafter she made no inquiries of the children, sent them no greeting cards, no presents, and had no communication with them for more than eight months or until December

of 1971 when she forwarded a letter giving an address at Clearwater Beach, Fla., and in which she stated her intention to eventually obtain custody of her three children. The Welfare Services replied to this communication on December 21, 1971, suggesting that since there had been no contact with them concerning the children for almost a year, Mrs. Stone should indicate her good faith by contributing to the support of the children and, finally, stating that unless some steps were taken, the agency would assume that she was no longer interested in the care of her children and that permanent living arrangements would be made for them. Following this communication, Mrs. Stone admittedly made no contacts with the agency until she received notice of the hearing on this petition, sent neither holiday greetings nor presents to any of the children, and made no contributions toward their support.

While Mrs. Stone at the hearing spoke of her concern and interest for the children, it is very apparent that when the children were removed from her care she was principally interested in her paramour, Hoover Hurley. It was with him that she departed to Florida where she remained at all times after early 1971 until she came here for the hearing on the petition on October 16, 1972. At the time of the hearing she was still married to Earl Stone but admitted that she had been living in an illicit relationship here and in Florida with Hoover Hurley who, likewise, was married to another person. It is clear that Mrs. Stone's interests lay in her relationship with Hoover Hurley and not with her children.

We are unaware of any appellate court cases construing section 311 of the Adoption Act of

1970, but it is apparent by the change in the language of the new act that the legislature intended to *terminate the parental rights of a parent by conduct insufficient to support a finding of abandonment under the prior law.* In construing the abandonment provisions of the *prior* act, Mr. Justice O'Brien said in Sarver Adoption Case, 444 Pa. 507, 510:

"'In order to sustain [a finding of abandonment], it must appear that the parent intended to give up the child absolutely, never to claim it again, and that this intention was manifested for a period of at least six months . . . Therefore, any action on the part of the appellant within this period inconsistent with "a settled purpose" to relinquish her parental claim to the child would preclude a finding of abandonment.'"

In this case, Mrs. Stone had no contact whatever with her children for two periods of more than six months each; first, from February of 1971 until December of 1971, and secondly, from December of 1971 until September of 1972. Since there was, following the first six months' period, a contact by the mother before any action had been taken to terminate her rights, we are concerned only with the period from December of 1971 to September of 1972. We conclude that during this period of more than six months, Mrs. Stone did evidence a settled purpose of relinquishing her parental claim to all three children and, further, has refused and failed to perform her parental duties toward them. Her conduct thus satisfies the test of section 311(1) of the Adoption Act of 1970, as well as fully meeting the test enunciated in Sarver, supra.

Counsel for the respondent has cited in support

of the respondent's position the Sarver Adoption Case, supra, and Adoption of Eck Children, 21 Cumb. 64. These cases involved situations where the natural mother indicated that she did not make contacts with the children because she did not desire to upset them or confuse them. Significantly, too, in both of these cases the children were in the custody of private individuals in one case, in the custody of a paternal aunt, and in the other case, in the custody of the natural father and his second wife. None of the circumstances present in those two cases are present here.

Our courts have clearly indicated, as stated in Davies Adoption Case, 353 Pa. 579, 587, that:

"Abandonment is not an ambulatory thing the legal effects of which a delinquent parent may dissipate at will by the expression of a desire for the return of the discarded child . . . [O]nce abandonment has been proven with required legal sufficiency, the welfare of the abandoned child is the primary and paramount concern of the court unaffected by the desire or caprice of the abandoning parent."

Therefore, the present interest expressed by Mrs. Stone for her children, coming as it does after the six-months' period has passed, does not operate to nullify that which follows from her unconcern for the children during the six-months' period.

Respondent further contends that her constitutional rights were violated because the children were committed to the care and custody of the Cumberland County Child Welfare Services in the juvenile court without a hearing. In support of this contention, the respondent cites section 8 of the Act of June 2, 1933, P. L. 1433, 11 PS §250;

however, a reading of this section discloses that it pertains only to court orders pursuant to a hearing and, in fact, does not in any manner indicate that a hearing is mandatory. Furthermore, the petition alleging the neglect and dependency of the children averred that at the time they were removed from the home of respondent, they were found to be "in the care of an eight-year-old baby-sitter." Thus, the petition on its face supports the entry of an emergency order even though the order itself refers to the fact that additional information was supplied to the court by petitioner. Section 6 of the Act of June 2, 1933, P. L. 1433, as amended, 11 PS §248, clearly authorizes the juvenile court to enter preliminary orders upon the filing of a petition with the court. We cannot quarrel with the position of respondent that a hearing on the petition should have been held; however, by respondent's own testimony, she left this area in January of 1971 and moved to Florida "to start a new life" and thereafter, not only did not request a hearing, but, in fact, failed to reveal her whereabouts. Thus, she could not have had notice of any hearing. Under these circumstances, she is in no position to complain of the failure of the court to hold a hearing on the petition filed in the juvenile court.

Respondent also contends that the present proceeding for termination of respondent's parental rights is improper because no petition to adopt any of the children or any intention to do so has been filed with the court. One of the avowed purposes of the Adoption Act of 1970 was to permit the determination of the rights of parents independently of adoption placement where the child was in the custody of an agency. This was a salutary provision because it eliminated the need to involve prospective adopting

parents in the proceeding to the detriment of the child. It is abundantly clear from section 312 of the act that it is only where an individual has custody or is standing in loco parentis to a child that there is the requirement that a report of intent to adopt shall have been filed before a petition for involuntary termination of parental rights is acted upon. The absence of any indication that adoption petitions or reports of intent have been filed with respect to any of these children does not prevent action upon the petition filed.

## ORDER OF COURT

And now, January 8, 1973, for the reasons set forth in the foregoing opinion, it is ordered and directed that the rights of Betty Stone as the natural mother of the children Toni Lynn, Tina Irene, and Carol Ann Stone, be and are hereby terminated and a decree to that effect in the usual form with respect to each child is entered concurrently herewith.